[L. A. No. 18808. In Bank. Nov. 20, 1945.]

THE GOSPEL ARMY (a Corporation), Respondent, v. CITY OF LOS ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, Frederick von Schrader, Assistant City Attorney, and Wilbur Bassett, Deputy City Attorney, for Appellants.

Robert H. Wallis for Respondent.

TRAYNOR, J.—Certain ordinances of the City of Los Angeles regulate transactions in secondhand goods and solicitations for charitable purposes. Plaintiff, an incorporated religious organization, brought this suit to enjoin the enforcement of these ordinances as applied to it on the ground they abridged its religious liberty in violation of the Constitution of the United States and the Constitution of California. The trial court found that plaintiff is ''engaged exclusively in the promulgation, by literature and word of mouth, of its religious beliefs, by and through its auxiliaries, and in the procuring of donations in the form of money and articles of value in the prosecution and furtherance of its religious activities.'' It enjoined defendants from ''further interference and · threatened acts, which would in any way prevent the free exercise of the religious liberty and freedom of worship of the said Plaintiff.'' Defendants appeal.

The finding of the trial court must be viewed in the light of the evidence, which is undisputed. Religious services at plaintiff's mission are conducted by a minister ordained by it whose compensation depends entirely on solicited contributions. Plaintiff engages in missionary work, distributes the New Testament and religious tracts free to the public, and gives assistance to those in need. It collects salvage from the public to obtain funds to propagate its religious doctrines and to provide aid to the poor. Some of the salvage is sold in a secondhand goods store operated by plaintiff; some, such as clothing, is distributed to the poor; goods not suitable for

further use go directly to a salvage mill. The salvage is collected by plaintiff's "industrial solicitors" in four of plaintiff's trucks. The money received from the sale of secondhand goods in plaintiff's store is used to meet the cost of operating the store, including the compensation paid to the manager and the solicitors. Whatever remains is paid into plaintiff's treasury. Ninety per cent of the money received for the mill material goes to the drivers of the trucks; the remainder is turned over to the manager of the store for plaintiff's treasury.

Other employees of plaintiff solicit money from the public. Solicitors make the object of their mission known by showing to prospective donors a printed card stating that "the bearer whose signature is hereon attached for identification is duly authorized to solicit money, food, clothing or any other useful articles that will help the Gospel Army to carry on their religious home missionary and evangelical work among the poor and under-privileged." About fifty per cent of the funds raised is absorbed by the cost of soliciting, including the compensation of the solicitors, which is paid on a percentage basis. The funds remaining are used to pay the cost of furnishing tracts and religious literature free to the public and to supply food, lodging, clothing and car fare to the poor.

■ Section 24.01 of the Los Angeles Municipal Code defines a "junk dealer" as "a person having a fixed place of business in this City who goes from house to house or from place to place, gathering, collecting, buying, selling or otherwise dealing in any old rags, sacks, bottles, cans, paper, metal or other articles commonly known as junk." A "secondhand dealer" is "a person engaging in, conducting, managing, or carrying on the business of buying, selling or otherwise dealing in secondhand goods, wares or merchandise." Junk dealers and secondhand dealers must obtain a permit to engage in business from defendant city's Board of Police Commissioners. The following "Requisites of Permits" are set forth in subsection (c) of Section 24.01: "(1) Persons desiring to obtain a permit to conduct, manage or deal in any business mentioned in subsection 'a' of this Section shall file an application in writing with the Board specifying by street and number the place where such business is proposed to be conducted or carried on; junk collectors having no fixed place of business shall specify in such application their residence by street number. The application shall be signed by the applicant and shall contain his residence address. (2) Before receiving an

application for any permit the Board shall require the payment of such fees as are hereafter specified. (3) Upon receipt of such application the Board shall cause to be investigated the business of the applicant and location at which applicant proposes to engage in business as specified in said application. Thereafter the Board may issue a permit to the applicant which shall be effective for the remaining portion of the current year. (4) Persons operating under the provisions of this Section shall be required to secure an annual renewal of such permit commencing January 1st of the succeeding year in which such permit was granted. (5) No person holding a permit to conduct, manage, carry on or deal in any business mentioned in subsection 'a' of this Section shall buy, sell or otherwise deal in secondhand jewelry, precious stones, precious metals (including old gold), watches or other similar secondhand merchandise without first applying for and receiving a special permit therefor from the Board in the manner provided in this Section for securing ordinary permits.'' The fees prescribed are set forth in subsection (d): ''(1) Applications for permits other than provided for in this subsection shall pay the sum provided in Section 22.10; (2) Applications for special permits, the sum of $50.00; (3) Applications for annual permit renewal, the sum of $25.00; (4) Applications for changing location of place of business for which a permit has been granted, the sum of $10.00; (5) Change of ownership, the sum of $10.00, to be applicable only in cases where the new owner is already operating under a permit issued pursuant to provisions of this Section.'' Subsection (e) provides: ''(1) The Board shall not grant any permit provided for in this Section to persons who fail, refuse or neglect to comply with the laws and ordinances relating to and regulating the business for which such permit is sought. (2) Persons applying for or obtaining permits under the provisions of this Section shall comply with the provisions of this Section.'' Subsection (f) provides for the revocation of permits: ''Any permit issued under the provisions of this Section may be revoked or suspended upon the grounds provided for in this Section: (1) . . . If persons holding permits under the provisions of this Section shall violate any of the provisions of this Section or any provisions of any other ordinance, or any law relating to or regulating any such business, or shall conduct or carry on such business in an unlawful

manner, the Board, in addition to any other penalties provided by this Code, shall revoke such permit issued to such person; (2) . . . Permits granted pursuant to this Section shall be revoked only in the manner provided in Section 22.02 of this Code; (3) . . . No permit shall be granted to any person to conduct, manage, carry on or deal in any business mentioned in subsection 'a' of this Section whose permit has been revoked by the Board until six (6) months have elapsed after such revocation.'' Holders of permits must keep a complete record of all goods purchased or received by them, which is open to inspection by any member of the police department. They must also file with the Chief of Police daily reports on prescribed forms of the goods purchased or received during the preceding day, describing the article and specifying the hour of the day when it was acquired, the name and address of the party from whom it was acquired, the height, age, sex, complexion, and other characteristics of that person. The hours of business are prescribed. Secondhand dealers must keep the articles received by them 21 days before selling them. The period prescribed for junk dealers is three days. With respect to certain articles classed as scrap, junk dealers are exempted from the provisions requiring the keeping of records, the filing of reports, and the keeping of articles for three days. There are comparable exemptions for secondhand dealers. If a claim is made that property in the hands of the holder of a permit is stolen, the board, in the event no court action is pending, may determine whether or not the property was stolen from the claimant and order its return if it was. If such an order is disobeyed, the board may revoke the permit. The foregoing provisions are reasonable, and the standards prescribed are adequate. (*In re Holmes,* 187 Cal. 640, 646 [203 P. 398]; *Co-operative Junk Co.* v. *Board of Police Commissioners,* 38 Cal.App. 676, 679 [177 P. 308]; *Zemansky* v. *Board of Police Commissioners,* 61 Cal.App.2d 450, 453-455 [143 P.2d 361]; see 30 A.L.R. 1427; 88 A.L.R. 970, 972; 7 Cal.Jur. 10-yr.Supp. 366; 33 Am.Jur. 336-339, 355; 47 Am.Jur. 555.)

■ Regulation of the business of junk dealers and secondhand dealers is designed to protect the public interest by preventing such dealers from becoming outlets for stolen goods. No question arises as to the constitutionality of such regulation when the business regulated is not carried on by a religious organization. (*Lewis* v. *Quinn,* 217 Cal. 410, 413 [19

P.2d 236] ; *In re Holmes, supra; Co-operative Junk Co.* v. *Board of Police Commissioners, supra; Zemansky* v. *Board of Police Commissioners, supra;* see 30 A.L.R. 1427; 88 A.L.R. 970, 972; 7 Cal.Jur. 10-yr.Supp. 366; 33 Am.Jur. 336-339, 355; 47 Am.Jur. 554.) Business carried on by a religious organization cannot be differentiated, for the reasons set forth below with respect to the validity of the regulation of plaintiff's solicitation of funds for charity.

Sections 44.01 to 44.19 of the Los Angeles Municipal Code regulate solicitations of funds for charity. The term "charitable" includes "Philanthropic, social service, benevolent, patriotic, either actual or purported." The term "contribution" includes "alms, food, clothing, money, property or donations under the guise of a loan of money or property." (§ 44.01.) Certain provisions, applicable to solicitors of charitable contributions in general, are designed primarily to secure information that will assist the public in judging the nature and worthiness of the cause for which the solicitation is made and to insure the presentation of such information to prospective donors. We find nothing unduly burdensome or unreasonable in any of these provisions. Section 44.05, which is quoted in the margin*, requires any person who solicits for any charitable purpose to file with the Department

---

*"'No person shall solicit, nor shall any officers or member of any association authorize any person to solicit, any contribution for any charitable purpose unless, within the fiscal year of the City in which such solicitation is made and at least within ten (10) days prior to the beginning of such solicitation, there shall have been filed with the Department, on a form furnished by said Department, by such person or association upon whose behalf the solicitation is made, written Notice of Intention to solicit such contribution, which notice shall contain complete information as follows:

"(a) The purpose of the solicitation and use of the contribution to be solicited;

"(b) A specific statement, supported by reasons and, if available, figures, showing the need for the contribution proposed to be solicited;

"(c) The character of such solicitation and how it will be made or conducted;

"(d) The expenses of the solicitation, including salaries and other items, if any, regardless of from what funds such expenses are payable;

"(e) What portion of the contributions collected as a result of the solicitation will remain available for application to the specific purposes declared in the Notice of Intention as the object of the solicitation;

"(f) A specific statement of all contributions collected or received by such person or association within the calendar year immediately preceding the filing of such Notice of Intention. The expenditure or use made of such contributions, together with the names and addresses of all persons or associations receiving salaries, wages, compensation, com-

of Social Service a notice of intention to solicit ten days before the solicitation. This notice must contain, among other things, information regarding the purpose, character, method, and estimated expenses of the solicitation, the need for the contribution to be solicited, the proposed use of the solicited funds, the amount that will remain available for charitable purposes over expenses, the amount received from solicitations in the preceding calendar year, the expenses of such solicitations, and the amount that remained available for charitable purposes. The department may investigate the statements in the notice of intention. (§ 44.03 (a).) Information cards setting forth the facts in the notice of intention and such other facts as in the opinion of the Board of Social Service Commissioners will be of assistance to the public in determining the nature and worthiness of the solicitation (Section 44.06 quoted in the margin†) are issued by the Department of Social Services for four cents per card. (§ 44.03(e).) The infor-

---

missions or emoluments from such contributions, and the respective amounts thereof;

"(g) The names and addresses of the officers and directors of any such association for which the solicitation is proposed to be made;

"(h) A copy of the resolution, if any, of any such association authorizing such solicitation, certified to as a true and correct copy of the original of such resolution by the officer of such association having charge of the records thereof;

"(i) A statement that the signers of such Notice have read and are familiar with the provisions of this Article and will require all solicitors engaged in such solicitation to read and be familiar with all sections of this Article prior to making any such solicitation."

†"There shall be filed with the Department with such Notice of Intention a statement of any agreement made with any agent, solicitor, promoter, manager or conductor of such solicitation, together with a copy of each agreement which may be in writing. Within twenty-four hours after any change in any such agreement or the making of any new or further agreement, a true copy of such change or agreement, if in writing, or if not, written details thereof shall be filed with the Department. Whenever, in the opinion of the Board, the Notice of Intention filed with the Department does not disclose sufficient information for the public concerning the facts hereinabove required to be stated in such Notice or concerning the person or association making such solicitation or on whose behalf such solicitation is made, then, upon the request of said Department, there shall be filed, in writing, within forty-eight (48) hours after such request, such additional information as may be required by said Board upon the foregoing subjects. Provided, however, that the Board, for good cause, may extend the time for filing such additional information. The Notice of Intention and such additional information, if requested, shall be signed by such person intending to make such solicitation, or if by or on any association, by at least two officers of such association and shall be open to the inspection of the public."

mation cards, which are in effect permits to solicit, are issued automatically upon the filing of the required information and the payment of the four cents for each card. The department is given no authority to withhold such cards when these requirements are met, and we cannot assume that it will abuse its authority in order to withhold them. As this court said in *In re Holmes,* 187 Cal. 640, 647 [203 P. 398], quoting from *In re Flaherty,* 105 Cal. 558, 562 [38 P. 981, 27 L.R.A. 529] and *Gaylord* v. *City of Pasadena,* 175 Cal. 433, 437 [166 P. 348] : " 'Laws are not made upon the theory of the total depravity of those who are elected to administer them; and the presumption is that municipal officers will not use these small powers villainously or for purposes of oppression or mischief.' If this petitioner had applied for a permit under the requirement of the section of the charter above quoted, and been either whimsically or arbitrarily refused such permit, he might then, as is shown in *Gaylord* v. *City of Pasadena, supra,* have had recourse to the courts for relief from such unjust and arbitrary action.''

Each solicitor must exhibit an information card to the prospective donor and must not make any misstatements. A solicitor must also carry written authorization from the association that he represents. The board may recall the cards and amend them if it receives additional information showing that any statements thereon are incorrect. The board may not disallow a proposed solicitation but it may investigate the statements in the notice of intention and the methods of making or conducting the solicitation; it may inspect the records of the person in charge of the solicitation and the association for whom it is made, and it may give such publicity to its findings as it deems best to reach the general public and persons interested. The association for whom the solicitation is made must maintain an accounting system recording the entry of all donations and disbursements. (§ 44.08.)

More restrictive provisions are applicable to promoters. A promoter is ''any person who for pecuniary compensation or consideration received, or to be received, solicits or is engaged in the business of or holds himself out to the public as engaged in the business of soliciting contributions for or on behalf of any other person or any charitable association, corporation or institution, or conducts, manages or carries on . . . any drive or compaign for any such purpose; provided, however, that

pecuniary compensation or consideration as used herein, shall include, but shall not be limited to, participation on a percentage basis in any fund solicited, or raised, for or on behalf of any other person, firm, association or corporation; provided, further, that no person who is a bona fide paid officer or employee of a social service agency endorsed by the Board of Social Service Commissioners, shall be considered a promoter within the meaning of this article.'' (§ 44.01.) The conditions that a social agency must meet to be endorsed by the Social Service Commission and the standards that govern the commission are set forth in a separate ordinance, the relevant part of which is quoted in the margin.* In our opinion

---

*''Sec. 2. Said Commission shall have power:

''1. To investigate, when requested or permitted, by the officers or persons in charge thereof all charitable corporations or philanthropic corporations or associations dependent upon public appeal or general solicitations for support, and submit quarterly, in writing, the result of such investigation to the Council.

''2. To endorse such of said charitable corporations or associations as shall apply to said Commission for endorsement and prove to the Commission that they have complied with the following provisions, namely:

''(a) That the title to any real property in the City of Los Angeles owned by such charitable corporation or association is vested in the name of said charity, if it be a corporation, or else in the name or names of a responsible trustee, or trustees under a declaration of trust or other written instrument, setting forth the rights of such charitable corporation or association therein, and recorded in the records of the County Recorder of Los Angeles County.

''(b) That the declared purpose for which such a corporation or association is organized are charitable or philanthropic, and not for the pecuniary profit of the members or associates thereof or any of them.

''(c) That for three months prior to its endorsement said charitable corporation or association has faithfully complied with the following provisions with reference to its accounts, namely: All funds received by it and all disbursements made by it, have been entered upon the books of its treasurer or other financial officer, receipts have been given or tendered for all money or other property donated to it, whenever required by law or ordinance; all expenditures other than petty cash to a reasonable amount have been made by checks signed by at least two officers of such corporation or association; that the bank book of such association or corporation has been balanced and reconciled with the books of account at reasonable intervals.

''(d) That no moneys of said corporation or association are on loan directly or indirectly to any officer, director, trustee or employee thereof, and that the corporation or association for a period of three months prior to its endorsement has not invested any moneys constituting part of its permanent endowment funds except in securities legal as investments for savings banks within the State of California, and has not paid out more than 15% of any amounts collected by solicitation within the City of Los Angeles for expenses of solicitation, and has not diverted funds donated to it from any source to purposes other than those for which they were donated.

''Provided, however, that the provisions of this paragraph shall not

the classification effected by this ordinance is reasonable and the standards provided are adequate.

A promoter must apply for a promoter's license. The application must set forth the applicant's qualifications and show that he is of good character and reputation. Persons working as solicitors for compensation under the promoter must be registered as solicitors. The board grants a promoter's license if it is satisfied that the applicant is of good character and reputation, is equal to the financial responsibility incident to the proposed solicitation and intends to conduct his business as promoter fairly and honestly. Similarly, before registering a solicitor, the board must be satisfied of his good character and reputation. A license fee of $25 is required for a promoter's license. A promoter must also file a $2,000 bond with the board to insure contributors against loss through theft. Solicitors must file a $500 bond and pay a registration fee of $1.00. The board may revoke a promoter's license, after a hearing, for any "unfair, unjust, inequitable or fraudu-

---

apply to any loan or investment that has been made prior to the passage of this ordinance.

"(e) That the work for which such corporation or association has been organized has been faithfully performed.

"(f) That the by-laws and other written rules and regulations of such corporation or association define the powers and duties of the officers of such corporation or association, and that a copy of the Articles of Incorporation of said charity, if it be a corporation, and a copy of the By-Laws and other written rules and regulations of such corporation or association have been filed with the Social Service Commission.

"(g) That within three months prior to its endorsement such a corporation or association has not violated any law or ordinance applicable to it.

"(h) That the officers and employees of such corporation or association are persons of good moral character and reputation and that the corporation or association has exercised reasonable care in selecting persons of good moral character and reasonable experience as solicitors for its funds.

"Said Commission shall issue said endorsement to any such corporation or association as shall comply with the aforesaid requirements. Said endorsement shall be valid for such time as shall be fixed by the Commission but not exceeding one year from date of its issuance.

"Said Commission shall report to the Council upon request by it the name of any corporation or association which is endorsed or has been refused endorsement by it, with a general statement of the reasons for its refusal.

"Said Commission shall also have power to request any endorsed corporation or association to make application for a new endorsement at or after the end of each fiscal year or at an earlier period if the Commission shall deem such requirement advisable, and if said corporation or association shall not so do its endorsement shall be withdrawn."

lent'' act of a promoter or his employees, or agents in making a solicitation or conducting the business of promoter. Any ground that would have led to denial of the license is also ground for its revocation.

Solicitations upon premises owned or occupied by the association upon whose behalf the solicitation is made, and the soliciting of funds solely from members of the soliciting association are not subject to the provisions concerning promoters and solicitors or to certain other regulatory provisions of the ordinance. ''Solicitations made solely for evangelical missionary or religious purposes'' are also exempted. If, however, they are conducted in such a manner as in the opinion of the board may give the persons solicited or the public the impression that the purpose of the solicitation is in whole or in part charitable, the board may investigate the matter and give such publicity to its findings as it may deem best to advise the public of the facts. (§ 44.16.)

Plaintiff contends that since the practice of charity and the solicitation of funds for that purpose are part of its religious duties, the ordinances regulating the solicitation of charitable contributions cannot apply to plaintiff's solicitations without abridging its religious liberty in violation of the Constitution of the United States and the Constitution of California.

Religious liberty ''embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.'' (*Cantwell* v. *State of Connecticut*, 310 U.S. 296, 303 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352.] The constitutional guarantee protects the profession of a religious belief by word of mouth or in writing, the dissemination of the doctrines of a religious organization by preaching from the pulpits or other methods of evangelism, or the right to refuse to state beliefs against the dictates of one's conscience. (*Murdock* v. *Pennsylvania,* 319 U.S. 105, 109 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81] ; *West Virginia* v. *Barnette,* 319 U.S. 624, 642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].) ''If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word of mouth or act their faith therein.'' (*West Virginia* v. *Barnette,* 319 U.S. 624, 642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].) It does not follow,

however, that religious organizations enjoy unlimited freedom in carrying on all activities related to their religious program. As the United States Supreme Court declared in *Murdock* v. *Pennsylvania,* 319 U.S. 105, 109-110 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81]: ''we do not intimate or suggest . . . that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment. *Reynolds* v. *United States,* 98 U.S. 145, 161-167, 25 L.Ed. 244, and *Davis* v. *Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637, denied any such claim to the practice of polygamy and bigamy. Other claims may well arise which deserve the same fate. We only hold that spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types.''

Many activities prompted by religious motives can hardly be differentiated from secular activities. If the applicability of government regulation turned on the religious motivation of activities, plausible motivations would multiply and in the end vitiate any regulation. ''Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. . . . Where a restriction of the use of highways . . . is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions.'' (*Cox* v. *New Hampshire,* 312 U.S. 569, 574 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396].) In *Prince* v. *Massachusetts,* 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645], it was contended that religious liberty was abridged by the application of a statute regulating child labor to a guardian who permitted her minor ward to distribute religious literature on the streets at night. In vindicating the state's power to regulate in this way the dissemination of religious beliefs, the court declared: ''The parent's conflict with the state over control of the child and his training is serious enough when only secular matters are concerned.

It becomes the more so when an element of religious conviction enters. Against these sacred private interests, basic in a democracy, stand the interests of society to protect the welfare of children, and the state's assertion of authority to that end, made here in a manner conceded valid if only secular things were involved. The last is no mere corporate concern of official authority. It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growing into free and independent well-developed men and citizens. Between contrary pulls of such weight, the safest and most objective recourse is to the lines already marked out, not precisely but for guides, in narrowing the no man's land where this battle has gone on . . . the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds* v. *United States,* 98 U.S. 145, 25 L.Ed. 244; *Davis* v. *Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interests in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. . . . It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction.''

Activities characteristic of the secular life of the community may properly be a concern of the community even though they are carried on by a religious organization. (See, *Prince V. Massachusetts,* 321 U.S. 158, 165 [64 S.Ct. 438, 88 L.Ed. 645]; *United States* v. *Ballard,* 322 U.S. 78, 87 [64 S.Ct. 882, 88 L.Ed 1148]; *Murdock V. Pennsylvania,* 319 U.S. 105, 109 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R 81]; *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 571 [62 S.Ct. 766, 86 L.Ed. 1031]; *Cox* v. *New Hampshire,* 312 U.S. 569, 574 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396]; *Davis* v. *Beason,* 133 U.S. 333, 342 [10 S.Ct. 299, 33 L.Ed. 637]; *In re Dart,* 172 Cal. 47, 56 [155 P. 63, Ann.Cas. 1917D 1127, L.R.A. 1916D 905]; *Chrisman* v. *Culinary Workers' etc.,* 46 Cal.App.2d 129, 132 [115 P.2d 553]; *People* v. *Pierson,* 176 N.Y. 201 [68 N.E.

243, 98 Am.St.Rep. 666, 63 L.R.A. 187] ; *City of St. Louis* v. *Hellscher*, 295 Mo. 293 [242 S.W. 652] ; *Commonwealth* v. *Childs*, 299 Mass. 367 [12 N.E.2d 814] ; *Commonwealth* v. *Green*, 268 Mass. 585 [168 N.E. 101] ; *Commonwealth* v. *Plaisted*, 148 Mass. 375 [19 N.E. 224, 12 Am.St.Rep. 566, 2 L.R.A. 142] ; *State* v. *White*, 64 N.H. 48 [5 A. 828] ; *Stull* v. *Reber*, 215 Pa. 156 [64 A. 419, 7 Ann.Cas. 415] ; *Matter of Frazee*, 63 Mich. 396, 405 [30 N.W. 72, 6 Am.St.Rep. 310] ; *State* v. *Chenoweth*, 163 Ind. 94, 99 [71 N.E. 197] ; see, also, Zollman, *Religious Liberty in the American Law*, 17 Mich.L.Rev. 355, 456.) Religious organizations engage in various activities such as founding colonies, operating libraries, schools, wineries, hospitals, farms, industrial and other commercial enterprises. Conceivably they may engage in virtually any worldly activity, but it does not follow that they may do so as specially privileged groups, free of the regulations that others must observe. If they were given such freedom, the direct consequence of their activities would be a diminution of the state's power to protect the public health and safety and the general welfare. With that power so easily diminished there would soon cease to be that separation of church and state underlying the constitutional concept of religious liberty. (See *Evans* v. *Selma Union High School Dist.*, 193 Cal. 54 [222 P. 801, 31 A.L.R. 1121] ; *Knowlton* v. *Baumhover*, 182 Iowa 691 [166 N.W. 202, 5 A.L.R. 841] ; *People ex rel. Ring* v. *Board of Education*, 245 Ill. 334 [92 N.E. 251, 19 Ann.Cas. 220, 29 L.R.A.N.S. 442] ; *Board of Education of Cincinnati* v. *Minor*, 23 Ohio St. 211 [13 Am.Rep. 233] ; *Donahoe* v. *Richards*, 38 Me. 379 [61 Am.Dec. 256].)

There is no doubt that plaintiff, like many religious organizations, regards the practice of charity as a religious duty. It is not exclusively a religious activity, however ; many charitable activities spring from sources in the everyday life of the community unrelated to religion. The state itself has an active responsibility for the welfare of the poor, the aged, the sick, the unemployed, and the orphaned. There is a public interest in regulating the solicitation of funds for these purposes. The very worthiness of such purposes creates a risk that the charitable impulses of people may be taken advantage of by solicitors who would collect funds under false pretenses or retain for themselves an undue percentage of what they collected. Fraud in the solicitation of charitable contributions

can be most effectively controlled by measures such as the regulation in question requiring the presentation of information to enable the public to determine the nature and worthiness of the purpose for which the solicitation is made, and requiring proof of the good character and reputation of paid solicitors. In the words of Mr. Justice Shaw, speaking for a majority of the court in *In re Dart,* 172 Cal. 47, 56 [155 P. 63, Ann.Cas. 1917D 1127, L.R.A. 1916D 905] : "The occupation of soliciting contributions to charitable purposes is clearly so far subject to the police power, that it may be regulated by laws or ordinances providing for a reasonable supervision over the persons engaged therein, and for the application and use of the contributions received to the purposes intended, in order to prevent unscrupulous persons from obtaining money, or other things, under the pretense that they were to be applied to charity, and to prevent the wrongful diversion of such funds to other uses, or to secure them against waste. Measures reasonably tending to secure these ends are unquestionably valid." (See cases collected in 57 A.L.R. 516, 128 A.L.R. 1361.)

The religious organization in *Cantwell* v. *Connecticut, supra,* on which plaintiff relies, solicited funds, not for charitable purposes but for its own support. Under the statute there involved it was allowed to engage in such solicitation only if the licensing officer determined that its cause was a religious one and issued a certificate to that effect. It was held that the vesting of this power in an administrative official amounted to "censorship of religion as the means of determining its right to survive" since under the statute the official's judgment was decisive as to what constituted a religious cause. The ordinance involved in the present case specifically exempts solicitations for religious purposes only; its object is to regulate all solicitations for charitable purposes. The Board of Social Service Commissioners has no authority to appraise the nature or worthiness of a religious cause. In the Cantwell case the court recognized that even the solicitation of funds for the support of a religious organization is subject to reasonable regulation: "The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous

restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.'' (310 U.S. 296, 305.)

*Thomas* v. *Collins,* 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], cited in support of plaintiff's contentions, ''does not involve the solicitation of funds or property.'' (65 S.Ct. 315, 324.) The court there held that a state could not constitutionally require a paid union organizer to register with the Secretary of State before making a public speech inviting a nonunion worker specifically and nonunion workers in the audience generally to join the union. ''We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.'' (65 S.Ct. 315, 327.) The court was careful, however, to distinguish cases in which the speaker solicits funds from the public: ''Once the speaker goes further, however, and engages in conduct which amounts to more than the right of free discussion comprehends, as when he undertakes the collection of funds or securing subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed. In that context such solicitation would be quite different from the solicitation involved here. It would be free speech plus conduct akin to the activities which were present, and which it was said the State might regulate, in *Schneider* v. *Irvington, supra,* 308 U.S. 147, 84 L.Ed 155, 60 S.Ct. 146, and *Cantwell* v. *Connecticut,* 310 U.S. 296, 84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352, both *supra.* That however must be done and the restriction applied, in such manner as not to intrude upon the rights of free speech and free assembly. In this case the separation was not maintained.'' In his concurring opinion in *Thomas* v. *Collins* Mr. Justice Jackson gives the following reasons for these variations in state power: ''This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.

"But it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us. *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674. Nor would I. Very many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press. These are thereby left great range of freedom."

■ ▪ The requirement that promoters and the solicitors working under them submit proof of their good character and reputation does not discriminate against plaintiff or other religious organizations or censor their religious beliefs, nor does the regulation vest arbitrary power in the administrative board in authorizing it to withhold a license if it is not satisfied that the applicant is of good character and reputation. Such a requirement is common in statutes regulating admission to professions and occupations involving duties of a fiduciary character. (*In re Stepsay,* 15 Cal.2d 71 [98 P.2d 489]; *Spears* v. *State Bar,* 211 Cal. 183 [294 P. 697, 72 A.L.R. 923]; *Leach* v. *Daughtery,* 73 Cal.App. 83 [238 P. 160]; *Riley* v. *Chambers,* 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418]; *Ex parte McManus,* 151 Cal. 331 [90 P. 702]; *Ex parte Whitley,* 144 Cal. 167 [77 P. 879, 1 Ann.Cas. 13]; *Gundling* v. *Chicago,* 177 U.S. 183, 187 [20 S.Ct. 633, 44 L.Ed. 725]; *Graves* v. *Minnesota,* 272 U.S. 425 [47 S.Ct. 122, 71 L.Ed. 331]; *New York ex rel. Lieberman* v. *Van De Carr,* 199 U.S. 552 [26 S.Ct. 144, 50 L.Ed. 305]; *Douglas* v. *Noble,* 261 U.S. 165 [43 S.Ct. 303, 67 L.Ed. 590]; see, also, 12 A.L.R. 1435, 1450; 54 A.L.R. 1104, 1112; 92 A.L.R. 400, 415; Rottschaefer, Constitutional Law, pp. 466-482.) The filing of a bond is also a common requirement in the regulation of occupations or activities involving the handling of entrusted funds. (*Palmer* v. *Continental Casualty Co.,* 205 Cal. 34, 35 [269 P. 638]; *Clark* v. *Patterson,* 213 Cal. 4 [300 P. 967, 75 A.L.R. 1124]; *Gundling* v. *Chicago, supra; People of the State of New York* v. *Perretta,* 253 N.Y. 305 [171 N.E. 72, 84 A.L.R. 636]; see 33 Am.Jur., Licenses, sec. 54; 87

A.L.R. 145; 95 A.L.R. 1224; 103 A.L.R. 405; 120 A.L.R. 950.) ██ The license fee is a reasonable one, covering the expenses of investigations and administration.

██ The board has no discretion to withhold a license if the applicant's good character and reputation and his financial responsibility are established and the required bond is filed. The board is not free to deny licenses, but must act reasonably in the light of the evidence presented. (*Riley* v. *Chambers,* 181 Cal. 589, 595 [185 P. 855, 8 A.L.R. 418]; *In re Holmes,* 187 Cal. 640, 647 [203 P. 398]; *Tarpey* v. *McClure,* 190 Cal. 593, 600 [213 P. 983]; *Bank of Italy* v. *Johnson,* 200 Cal. 1, 32 [251 P. 784]; *People* v. *Globe Grain and Mill Co.,* 211 Cal. 121, 125 [294 P. 3]; *Cranford* v. *Jordan,* 7 Cal.2d 465, 467 [61 P.2d 45]; *Leach* v. *Daugherty,* 73 Cal.App. 83 [238 P. 160]; *Hall* v. *Geiger-Jones Co.,* 242 U.S. 539, 554 [37 S.Ct. 217, 61 L.Ed. 480]; *Graves* v. *Minnesota, supra,* p. 428; *Douglas* v. *Noble, supra,* p. 170; *New York ex rel. Lieberman* v. *Van De Carr, supra; Plymouth Coal Co.* v. *Commonwealth of Pennsylvania,* 232 U.S. 531, 545 [34 S.Ct. 359, 58 L.Ed. 713]; *Minnesota* v. *Probate Court,* 309 U.S. 270, 277 [60 S.Ct. 523, 84 L.Ed. 744, 126 A.L.R. 530]; *Yakus* v. *United States,* 321 U.S. 414, 434, 435 [64 S.Ct. 660, 88 L.Ed. 834].)

The provision empowering the board to revoke a license in case of unfair, unjust, inequitable or fraudulent practices of solicitation is neither vague nor uncertain and affords no possibility for the censorship of religious beliefs. In *Agnew* v. *Daugherty,* 189 Cal. 446, 448-449 [209 P. 34], this court upheld a similar provision in the Corporate Securities Act making the granting of a permit dependent on the commissioner's finding that the "proposed plan of business . . . is not unfair, unjust or inequitable" and that the methods to be used to dispose of securities "are not such as, in his opinion, will work a fraud upon the purchaser thereof." (See, also, *People* v. *Kuder,* 93 Cal.App. 42 [269 P. 198, 630]; *People* v. *Stewart,* 115 Cal.App. 681, 689 [2 P.2d 195]; *Yakus* v. *United States, supra,* pp. 426-427 and cases there cited.)

It is contended that since the trial court found that plaintiff is engaged exclusively in religious activities, the Charities and Relief Ordinance is rendered inapplicable to plaintiff's solicitations because of its provision that it "shall not be applicable to solicitations made solely for evangelical, missionary

or religious purposes.'' There is no conflict in the evidence, however, as to what plaintiff's activities are. The issue presented is one of law, namely, whether the charitable purposes for which plaintiff solicits funds are exclusively religious purposes within the meaning of the ordinance. The trial court erroneously concluded that because plaintiff solicits funds for charitable purposes as part of its religious program its solicitations are solely for religious purposes within the meaning of the ordinance. The ordinance specifically differentiates charitable from religious purposes. No person may solicit ''any contribution for any charitable purpose'' without complying with the requirements of the ordinance. The ordinance does not exempt solicitations for charitable purposes undertaken by religious organizations. Solicitations for charitable purposes, namely, for ''philanthropic, social service, benevolent, patriotic'' purposes, are subject to regulation whether or not they are undertaken by a religious organization. The intention to maintain a sharp differentiation between charitable and religious purposes is apparent in the provision that if a solicitation for religious purposes is likely to give the public the impression that funds are sought for charity, the board shall ''investigate the matter of such solicitation and give publicity to its findings thereon in such manner as it may deem best to advise the public of the facts of the case.'' The solicitation of funds to provide food, shelter, and clothing for those in distress is clearly for a charitable purpose and is therefore regulated by the ordinance. Plaintiff admittedly solicits funds for the purpose of giving relief to persons in distress. Since this purpose is charitable within the meaning of the ordinance, plaintiff's solicitations for that purpose are subject to the ordinance.

The judgment is reversed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

CARTER, J.—I dissent. The majority opinion places the stamp of validity *in toto* upon a regulatory ordinance containing requirements so stringent that with their enforcement humble charities and good works must inevitably bow to

''The organized charity scrimped and iced
''In the name of a cautious statistical Christ.''

Admittedly the intrusion into community existence of re-

ligious activities characteristic of the secular life brings into sharp focus the conflicting loyalties to church and state, the clash of religious freedom with social legislation. (See *Conscience* v. *The State*, by Prof. C. C. McCown, 32 Cal.L. Rev. 1; *Liberty under the Fourteenth Amendment* by John Raeburn Green, 43 Mich. L.Rev 437; Bill of Rights Review of Am. Bar Ass'n., vol. 1, no. 2.)

Since 1940 the subject has been brought frequently before the United States Supreme Court by the sect known as Jehovah's Witnesses, and that court has been alert to protect the free exercise of religion against abridgement. Its recent decisions, rendered at a time when the currents of world thought have been against democracy and toleration, have, as Professor McCown comments, made a substantial contribution to the defense of the liberties guaranteed by the Constitution, and the emphasis in several of the opinions upon the rights of "little people," of causes that are humble, needy, and without financial resources, is particularly notable. Quoting from the cited article, "The justices of the Supreme Court echo the language of social and religious protest from almost the beginning of history (2500 B.C.) in Mesopotamia, Egypt, and later in Palestine, down to the present day. Such language is familiar in the Hebrew prophets, the Psalms, and the Gospels. The obligation of government to protect the rights of the weak against those who possess political and economic power has been repeatedly proclaimed by prophets, but all too seldom recognized by the powers that be. Both democracy and religion demand the protection of the advocate of unpopular causes, for practically every reform, whether political, social, or religious, begins as a protest against vested interests and majority opinions. . . . In dealing with Jehovah's Witnesses the Supreme Court has shown a sanity and a consideration for the ultimate issues involved which cannot but have some effect upon the cowardice of politicians and the impatience of crowds." (32 Cal.L.Rev. pp. 14, 30.) (See also *Cantwell* v. *Connecticut*, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352]; *Largent* v. *Texas*, 318 U.S. 418 [63 S.Ct. 667, 87 L.Ed. 873]; *Jamison* v. *Texas*, 318 U.S. 413 [63 S.Ct. 669, 87 L.Ed. 869]; *Murdock* v. *Pennsylvania*, 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81]; *Martin* v. *Struthers*, 319 U.S. 141 [63 S.Ct. 862, 882, 87 L.Ed. 1313]; *West Virginia* v. *Barnette*, 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].)

In these decisions state legislation impinging upon a claimed religious freedom has been held valid only where there has been a strong showing of an essential need for regulation in the interest of the public safety, health, and welfare, or for the maintenance of morals, peace, and order, protection against a clear and present danger, or the like.

During the world war, as also pointed out by Professor McCown, the rise of nationalism to the status of a religious cult and the contemporary sharpening of the Christian conscience revitalized and realigned issues that were supposedly settled. Social problems have arisen which are ancient, but also very modern, and they are made the more difficult of solution by the traditions and social, political, religious, and legal philosophies with which they are surrounded. This country, having just emerged from a great conflict in which a guarantee of religious liberty to all peoples was a major aim, should be on guard against the subtle undermining, in the guise of municipal regulation, of those very rights which it has gone to such lengths to secure for others. For this reason the majority holding in the present case, with its reactionary trend, is particularly deplorable.

Obviously the commission of crime in the name of religion cannot be tolerated and the state must be safeguarded. The public are entitled to reasonable protection in community life, and fanaticism or misguided earnestness cannot be allowed to hold rein over the goodwill of the people. But beyond situations of emergency and present danger, the field of regulation should be extremely narrow. Thus in *Schneider* v. *Irvington,* 308 U.S. 147, 161 [60 S.Ct. 146, 84 L.Ed. 155], the United States Supreme Court, after stressing the importance of preventing the restriction of enjoyment of the constitutional liberties, said: "In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases, arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reason advanced in support of the regulation of the free enjoyment of the rights."

Using this formula to test the legislation here under review, it appears that one of the main reasons advanced in support of the regulation is its asserted necessity to protect the public from fraud. Resort to the penal statutes and usual methods of dealing with this evil is said to afford insufficient protection, in that warm hearted and generous citizens are especially vulnerable to solicitations made in the name of a religion or charity because of the nature of the appeal and their reluctance to turn a deaf ear to any cry of the poor and needy. Thus a delicate social problem is posed. Which is the more important, to give the public added protection, over that of the penal statutes, against annoyance, inconvenience, and possible fraud, or to preserve intact the cherished right of religious liberty? Should the state essay, at the expense of invasion of a constitutional right, to protect a citizen from his own inclination, or perchance his weakness, in responding to charitable solicitation without due inquiry into the worth of the sponsored cause? Is it not more in keeping with the American tradition to instill in youth and preserve in the thought of the people that individual independence, strength of character, moral stamina, and perception which will enable them to judge personally the good or bad faith of a colporteur or solicitor and the merit of the cause he espouses?

That some fraud may escape detection is to be anticipated. This is more or less true in all walks of life despite volumes of protective legislation. But the diversion to wrongful channels of some part of the public contribution to charity is not a major catastrophe when weighed against the cost of protection effected only by carving a large slice from the bill of rights. Indeed it may be asked whether any community can afford to undertake a regulatory program which may largely deprive the public of the opportunity to hear and respond to pleas of other than organized and municipally approved charities, thus stifling the growth and character development gained by the exercise of pity, compassion, and generosity. Small are the sums contributed by the average community to charity when compared with the large amounts customarily spent for luxuries and entertainment. In one sense the benefit of the opportunity to give where the right hand knows not what the left hand is doing is of more intrinsic value than the actual raising of the money, for all are in need of the spiritual enrichment which comes of free will offering. There are few housewives who will not cheer-

fully give from their larder to ten itinerant mendicants rather than run the risk of turning away hungry one man worthy of alms. And by the same reasoning there is less danger from solicitation for unworthy causes than from regulations so stringent that they may crush the humble workers, the "little people," destroy their good deeds, impinge upon their practice of religion, and form a breeding ground for intolerance, totalitarianism, or narrow nationalism.

All of this has been given recognition in the decisions of the United States Supreme Court. In the Cantwell case it is said at pages 308 and 310, "But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy. The essential characeristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds. There are limits to the exercise of these liberties. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the states appropriately may punish. . . . *Equally obvious is it that a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.* Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application." (Italics ours.)

Again it is said in the Schneider case at page 164: "Conceding that fraudulent appeals may be made in the name of charity and religion, we hold a municipality cannot, for this reason, require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be carried to the homes of citizens; some persons may, while others may not disseminate

information from house to house. Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.'' The same is true with respect to abridgment of the right of religious freedom. Many recent pronouncements of similar tenor might be added to those above cited.

Before proceeding to a more detailed review of the legislation here involved, it may be stated that plaintiff is an incorporated religious organization and that it operates a mission and store, the latter being called its industrial department. Among its religious activities are the holding of religious services at its mission by a minister ordained by it, church services and missionary work, giving away the New Testament and religious tracts. It conducts its operations in substantially the following manner: Financial solicitors, working from its headquarters, endeavor to obtain money contributions. These contributions are delivered to the treasurer of the organization and are used for carrying on its religious activities. The present treasurer has been a solicitor for plaintiff for many years and retains 30 per cent of the funds collected. About 50 per cent of the funds are used for salaries and expenses. The minister's sole compensation is derived from contributions and it is said to cover no more than his expenses. Plaintiff also gives assistance in property and money to those in need. In operating its store or industrial department it acquires secondhand property, most of which is called salvage, and sold to the public. The remainder is disposed of as junk. The truck drivers who collect the property receive a percentage of the salvage, but they do not participate in the proceeds derived from operation of the store. They also retain all but 10 per cent of the proceeds of the sale of the junk. Solicitors of salvage work from trucks and receive an average of 50 cents an hour. The store uses its funds for expenses of operation and occasionally does charity work. The balance is delivered to plaintiff's treasurer. None of the salvage solicitors distribute plaintiff's religious literature.

Defendant department claims that plaintiff, in operating

its store, is a "promoter" as defined in the city ordinance, and demands that it obtain a license authorizing solicitations for the store. No demand is made in regard to religious activities, but a religious organization is required to file a notice of intention and obtain a permit to solicit funds for charitable purposes. Apparently defendant department determines whether an organization is soliciting for charity or for religion and has adopted a rule that 50 per cent of the amount collected must go for charitable purposes.

The trial court found on substantial evidence that plaintiff is a "duly constituted and functioning religious organization, engaged exclusively in the promulgation, by literature and word of mouth, of its religious beliefs, by and through its auxiliaries, and in the procuring of donations in the form of money and articles of value in the prosecution and furtherance of its religious activities," and that if plaintiff is required to obtain a permit and pay a license fee as a condition of solicitation and receipt of donations "to be used in the furtherance of said religious activities," this "will amount to a prior restraint on the exercise of [its] religious activities within the meaning of the Constitution of the United States . . . an infringement upon the free exercise of . . . religious liberty as protected by the Constitution."

These findings require a consideration first of the question whether plaintiff's operations come in whole or in part within the exemption provision of the ordinance. Solicitations upon premises owned or occupied by the association in whose behalf the solicitation is made, and the soliciting of funds from members of the association are not subject to the promoter, solicitor, and certain other regulatory provisions of the ordinance. Exemption is also extended to "solicitations made *solely* for evangelical, missionary or religious purposes," but with the proviso that if such solicitations are conducted in a manner which, in the opinion of the board, may give those solicited the impression that the purpose of the solicitation is in whole or in part charitable, the board may investigate the matter and give such publicity to its findings as it deems best to advise the public of the facts.

In considering the applicability of the exemption to plaintiff's activities it would at first blush appear, and the trial court concluded, that inasmuch as all of plaintiff's operations, including its charitable work, are conducted for and as part and parcel of and incident to its religious purpose, all must

come within the exemption. However, a review of the ordinance in its entirety indicates that by use of the word "solely" in the exemption clause, it was intended to differentiate between solicitations for promulgation and support of the religion or church itself, and solicitations for charitable work performed as part of the religious purpose, with exemption accorded to the former but not to the latter. If the exemption is thus unavailable where the religious organization solicits for charity in connection with the promulgation and exercise of its doctrines of religion (and this seems to be the interpretation placed upon the ordinance by the rules and regulations of the board and by the officers in enforcing it), then the validity of the regulatory provisions must be tested by the limitations, if any, which may be imposed upon the exercise of the right of religious liberty.

To a degree the majority opinion recognizes this fact but it implies, without straightway so declaring, that charitable undertakings are separable from the religious purpose inducing them, and that by severance they may be removed to the realm of secular affairs and there be subjected to governmental regulation without intrusion of the bothersome problem of preservation of the constitutional right of religious liberty. This implication is inherent in the discussion which starts with the declaration (p. 12): "Many activities prompted by religious motives can hardly be differentiated from secular activities. If the applicability of government regulation turned on the religious motivation of activities, plausible motivations would multiply and in the end vitiate any regulation," and proceeds to state (pp. 14-15): "Activities characteristic of the secular life of the community may properly be a concern of the community even though they are carried on by a religious organization. . . . Religious organizations engage in various activities such as founding colonies, operating libraries, schools, wineries, hospitals, farms, industrial and other commercial enterprises. Conceivably they may engage in virtually any worldly activity, but it does not follow that they may do so as specially privileged groups, free of the regulations that others must observe. . . . There is no doubt that plaintiff, like many religious organizations, regards the practice of charity as a religious duty. It is not exclusively a religious activity, however; many charitable activities spring from sources in the everyday

life of the community unrelated to religion. The state itself has an active responsibility for the welfare of the poor, the aged, the sick, the unemployed, and the orphaned. There is a public interest in regulating the solicitation of funds for these purposes. . . .''

In the above discussion the majority opinion quotes copiously from *Prince* v. *Massachusetts*, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645], a case which has been criticized as being out of line with other recent United States Supreme Court decisions. (See *Liberty Under the Fourteenth Amendment, supra*, at p. 446.)

It is true that religious liberty ''embraces two concepts —freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be'' (*Cantwell* v. *Connecticut, supra*, 310 U.S. 296, 303), and that where the religious organization conducts activities characteristic of the secular life of the community, they may be subject to proper regulation under the police power. But, as already pointed out, this power of regulation is not unrestricted and it can only be enforced with due regard to preservation of constitutional rights. Both freedom of religious thought and freedom of religious action come within the protection of the bill of rights. This freedom cannot be whittled away by carving out segments of religious activities and relegating them to the realm of secular affairs. If that were permitted, the right of action for a religious purpose could eventually be destroyed by the gradual severance and classification as secular of every activity undertaken to promote the religious purpose.

Aside from the pronouncements found in the late federal decisions, it has long been the law of this state that a charity conducted as part of a religious practice is inseparable from the religion itself. The utter impossibility of any severance is made plain in the case of *Application of Dart* (1916), 172 Cal. 47 [155 P. 63, Ann.Cas. 1917D 1127, L.R.A. 1916D 905], where in speaking of the Jewish and Christian religions it is said (pp. 55-56) : ''In both of these religions charity is the central word. It is enjoined, not as a good thing, or a wise thing, or as a kindly thing only, *but as a fundamental part of the religion itself*. Says the Jewish faith: 'On three things the world is stayed; on the Thorah (the law) and on worship and on the bestowal of kindness.' 'Now the end of the commandment is charity out of a pure heart,' says Paul

to Timothy. 'Charity is the scope of all God's commands,' preaches Chrysostom. 'All perfection of the Christian life is to be attained according to charity,' declares Thomas Aquinas. Does it need more, does it need so much, to show that in these religions *the bestowal of charity, the devotion of life to charity, are a part of the religion itself?* And does it demand discussion to establish so plain a truth as that touching religion there is a doubtful zone which legislation should be most reluctant to enter? The founders of the nation recognized it when they placed the great guaranty of religious liberty in the constitution of a free people, and it is for every court to see that that liberty is not encroached upon and that freedom gnawed and impaired by any experimental legislation however well meant. So when legislation does enter that uncertain domain, the fact that it is there must bring it to condemnation. In accordance with the dictate of the Constitution itself the doubt will be resolved in favor of religious liberty. And it will be found better in the long run that the free exercise of religion be preserved in its integrity, better for the nation, better for charity itself which owes so much to religion, even if the efficiency of religious charities be not up to the standard of perfection set by the Municipal Charities Commission. If, under that standard, seventy-five cents of every dollar would go to the objects of charity, while under the less efficient methods in vogue but fifty cents of each dollar actually reaches the beneficiaries, it is not to be forgotten that there will be many millions fewer of these dollars to be distributed in charity if the activities of the religious are hampered, thwarted, and stayed." (Italics ours.)

The above comment is extremely apropos. If, under defendants' interpretation and enforcement of the ordinance, plaintiff is to be denied the benefit of the exemption clause insofar as its charitable activities are concerned, then the regulatory provisions of the ordinance must be subjected to close scrutiny in order to determine whether they infringe the guarantee of religious liberty. Although concededly acts of charity, apart from religious motivation, might be performed by the state, or by a professed atheist or nonreligionist, nevertheless the evidence here establishes beyond contradiction that plaintiff's charities are an integral part of and inseparable from its religious purpose. From common knowledge, and in challenge to the severance theory of the majority

opinion, it must be said that acts of charity which do not stem, consciously or unconsciously, from early religious training or Christian inheritance are sparse. It is a matter of common historical knowledge that public charities and benevolent associations for the gratuitous relief of every species of distress, are peculiar to christianity; no other system of civil or religious policy has originated them; they form its highest praise and characteristic feature. The Apostle Paul in chapter XIII of his first Epistle to the Corinthians epitomized his concept of the essential intangibles of Christianity and concluded with the immortal verse: "And now abideth faith, hope, charity, these three; *but the greatest of these is charity.*" Thus charity is the heart and basic principle of plaintiff's religion. To destroy that heart leaves the body lifeless. Yet the majority opinion does just that. It declares charity to be a secular affair in spite of the above showing to the contrary and thus subjects the exercise by plaintiff of its religion to unrestricted regulation and ultimate destruction.

Moreover, the anomalous result of the majority opinion is that a religious organization may use its own funds for a charitable purpose without hindrance, but if it solicits directly for the charity, the solicitation is subject to the cumbersome ordinance provisions hereinafter discussed. This makes the matter merely one of the form of the solicitation. To avoid regulation and gain the protection of the exemption, the solicitor only needs to make his plea for funds in the name of his church. The church then receives the donations and uses them for any purpose it may choose, good or bad, charitable or uncharitable, and it is not reached by the ordinance provisions.

Proceeding now to test the regulatory provisions of the ordinance as against the claimed infringement of the constitutional guarantee of religious liberty, it will be noted that the majority opinion incorporates the provisions by marginal reference and then, upon a discussion replete with generalizations, none of which standing alone can be said to contain an incorrect statement of the law, it announces the broad conclusion that, "We find nothing unduly burdensome or unreasonable in any of these provisions" (p. 237); "In our opinion the classification effected by this ordinance is reasonable and the standards provided are adequate" (pp. 240-241).

Were each regulation discussed in detail and given separate consideration, it is doubtful that even the author of the opinion would say that none is unduly onerous. Section 44.05 imposes upon any person who wishes to solicit "any contribution for any charitable purpose," a duty of filing with the department at least ten days prior to the commencement of the work, a written notice of intention containing "complete information" upon eleven comprehensive phases of the undertaking. But a glance at this section shows that the much maligned income tax forms issued by the federal government are no more complex and demanding than is this notice of intention in its requirements of itemized data. One wonders where the average almsman or solicitor is to acquire the educational background to enable him to supply such statistics. Must the opportunity for exercising one's religion by doing charitable work be limited to those who are apt in reading, writing, and arithmetic?

The solicitor must show (a) "The purpose of the solicitation and use of the contribution to be solicited"; he must make (b) "A specific statement, supported by reasons and, if available, figures, showing the need for the contribution proposed to be solicited"; he must show (c) "The character of such solicitation and how it will be made or conducted." How can these requirements be fitted into the program of the itinerant religionist who solicits as he wanders, taking with the one hand to give freely with the other, reserving for himself only bare necessities? What freedom is left for the missionary and walking preacher who play so colorful a part on the American scene, soliciting their charities, spreading their doctrines, without preconceived plan and as each feels himself daily to be guided, and without compiling statistics or publishing abroad the good works.

Further requirements of the notice indicate that its enforcement will doubtless effect the disappearance of all but organized institutions, for the applicant must also show the following: "(d) The expenses of the solicitation, including salaries and other items, if any, regardless of from what funds such expenses are payable; (e) What portion of the contributions collected as a result of the solicitation will remain available for application to the specific purposes declared in the Notice of Intention as the object of the solicitation; (f) A specific statement of all contributions collected or received by such person or association within the calendar

year immediately preceding the filing of such Notice of Intention. The expenditure or use made of such contributions, together with the names and addresses of all persons or associations receiving salaries, wages, compensation, commissions or emoluments from such contributions, and the respective amounts thereof; (g) The names and addresses of the officers and directors of any such association for which the solicitation is proposed to be made; (h) A copy of the resolution, if any, of any such association authorizing such solicitation, certified to as a true and correct copy of the original of such resolution by the officer of such association having charge of the records thereof; (i) A statement that the signers of such Notice have read and are familiar with the provisions of this Article and will require all solicitors engaged in such solicitation to read and be familiar with all sections of this Article prior to making any such solicitation.'' This last quoted provision expressly bars all who have not attained a sufficient degree of learning to abide by its terms.

As a whole the involved demands are a far cry from the simple regulation endorsed in the Cantwell case, to wit: that ''Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The state is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience.'' (310 U.S. at p. 306.) A regulation such as that described is not unreasonable and affords a sufficient basis for the opening of an investigation in the event charges of fraud should be lodged against a solicitor. (*Murdock* v. *Pennsylvania*, 319 U.S. 105 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81].) Probably no sincere solicitor would protest having to register, carry an identification card, and conduct his activities in a seemly manner and at reasonable hours. But he should be immune from any more onerous legislative interference, even though to some, his efforts might appear to be misguided.

The ordinance contains further requirements even more burdensome than those above set forth. With the notice of intention there must be filed a statement of any agreement between solicitors and the organization for which they are soliciting. (§ 44.06.) Whenever in the opinion of the Board

of Social Service Commissioners the notice of intention does not contain sufficient information for the public concerning the facts required to be therein stated, there must be filed within 48 hours such additional information as the board requests. (§ 44.06.) The department has power to investigate the statements in the notice of intention and the methods and manner of solicitation, to inspect records of the association for which the solicitation is made, and to issue to solicitors information cards at four cents a card. These information cards are in effect permits to solicit and they must set forth the facts stated in the notice of intention and such additional information as in the opinion of the board will be of assistance to the public in determining the nature and worthiness of the purpose for which the solicitation is made. (§ 44.03.) The board may recall information cards when they receive additional information which renders incorrect any statement thereon and amend them. (§ 44.02.) No person shall employ any misstatement, deception, or fraud in connection with the solicitation (§ 44.04), or use a fictitious name (§ 44.07.) A person may not solicit for a charitable association unless it maintains records of receipts and disbursements. (§ 44.08.) Solicitors must have the written authorization of the organizations they represent. (§§ 44.10, 44.11.) They must exhibit their information card to the prospective donee when soliciting (§ 44.12), and file a complete report of their activities with the board (§ 44.14). They must give receipts to donees stating various facts. (§ 44.15.) Violation of the ordinance is made punishable as a crime.

In support of its declaration of the validity of these provisions, the majority opinion states that they confer upon the department no authority to withhold information cards when the requirements are met, and it cannot be assumed that the department will abuse its authority in order to withhold them. This is true, but it is also apparent that a procedure so complex and so costly in time and effort will, so far as many solicitors are concerned, be prohibitive. It is said in the Cantwell case (310 U.S. 296, 305) that ''The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose.'' Assuming that the provisions above quoted do not involve any religious test, nevertheless

they are so demanding as not only to open the door to unreasonable delay and abuse of discretion, but also as possibly to bar certain classes of solicitors found among the "little people." Obviously, they do unreasonably obstruct and delay the collection of funds.

Still more restrictive provisions of the ordinance apply to so-called "promoters," who are defined as "any person who for pecuniary compensation or consideration received, or to be received, solicits or is engaged in the business of or holds himself out to the public as engaged in the business of soliciting contributions for or on behalf of any other person or any charitable association, corporation or institution, or conducts, manages or carries on . . . or is engaged in the business of or holds himself out as engaged in the business of conducting, managing or carrying on any drive or campaign for any such purpose; provided, however, that pecuniary compensation or consideration as used herein, shall include, but shall not be limited to, participation on a percentage basis in any fund solicited, or raised, for or on behalf of any other person, firm, association or corporation; provided, further, that no person who is a bona fide paid officer or employee of a social service agency endorsed by the Board of Social Service Commissioners, shall be considered a promoter within the meaning of this article." (§ 44.01.)

Section 44.19, subdivision 1, provides that "No promoter shall in any manner whatsoever, solicit within the City of Los Angeles any contribution for any actual or purported charitable use, purpose, association, corporation or institution without license from the Board so to do."

Subdivision 2, entitled "Application," states that "To obtain such license, such promoter shall make and file with the Board an application therefor in writing. In such application, the applicant shall set forth, in addition to such information as may be required by the Board: (a) The name and address of the applicant. . . . (b) A succinct statement of facts showing that the applicant . . . is of good character and reputation. . . . (c) The general plan, character and method in or by which the applicant proposes to conduct its or his business as a promoter."

Subdivision 3 is entitled "Bond," and states: "At the time of so filing with the Board an application for such license the applicant shall file and thereafter maintain with

the Board a good and sufficient bond in the aggregate sum of . . . \$2,000 running to the City of Los Angeles for the use and benefit of interested persons and parties. . . . Said bond shall be conditioned upon the strict compliance, by the Principal, with the provisions of this Article and the payment of any direct pecuniary loss sustained, through any act of grand or petty theft on the part of the Principal, by any donor or by any person on whose behalf the funds or personal property were solicited or received by the Principal. . . ."

Subdivision 5, entitled "Investigation," provides that "The Board shall examine such application and shall make such further investigation of the applicant and its or his affairs as the Board shall deem advisable. If from such examination the Board shall be satisfied: (a) That the applicant is of good character and reputation. . . . (b) That applicant has sufficient financial responsibility to carry out the obligations incident to any solicitation such applicant may make within the City of Los Angeles as such promoter and that all of the statements made in such application are and each of them is true and that . . . applicant . . . has (not) violated any of the provisions of this Article or has (not) engaged in any fraudulent transaction or enterprise, and that the applicant intends to conduct its business fairly and honestly, the Board shall issue to the applicant a license to solicit as a promoter within the City of Los Angeles, contributions. Otherwise, the Board shall deny the application and refuse to issue a license, and shall notify the applicant of the decision of the Board. . . ."

Under the heading "Revocation," subdivision 6 states that "All licenses issued hereunder shall be subject to the condition that the applicant thereafter shall cease and desist from acting as a promoter within said City of Los Angeles when ordered so to do by the Board if the Board finds after a hearing . . . that any act or omission of such promoter . . . in making any solicitation or in the conduct of the business of promoter within the City of Los Angeles is unfair, unjust, inequitable or fraudulent. The Board must suspend or revoke any such license if, after hearing upon notice, the Board shall find the existence of any of the grounds hereinabove enumerated for the denial of an application for a promoter's license; provided, however, that such suspension or revocation shall be discretionary with the Board if the

only ground for such revocation is such that it does not affect the licensee's honesty and integrity, or his ability properly to perform his duties as a promoter.''

Subdivision 7 deals with ''Termination'' of licenses at the close of each fiscal year, and subdivision 8 with ''Funds.'' The latter subdivision provides that ''No promoter shall commingle any contribution with the promoter's own funds or property, or fail at any time to maintain and keep all contributions separate and apart from the promoter's own funds or property. . . . (a) It shall be unlawful for any promoter to cause or permit any person for pecuniary compensation or consideration received or to be received by such person to solicit or receive on his behalf or at his instigation, under his direction or control or in his employment, any contribution unless such person shall be registered as a solicitor by the Board. (b) No person shall be so registered as a solicitor unless he shall first appear personally before the Board and furnish satisfactory proof that he is a person of good moral character, that his reputation for honesty is good, and unless he first file with the Board and thereafter maintain a bond satisfactory to the Board in the sum of . . . $500.00, conditioned for the payment of any direct pecuniary loss which may be sustained by the promoter, by any donee, or by any person on whose behalf any contribution was solicited or received, through any act of grand or petty theft, committed by such person. (c) The provisions of paragraphs b, c, d, and e of subsection 3, above, shall apply to bonds filed pursuant to this subsection. (d) The Board shall collect a fee of . . . $1.00 for each such registration. . . .''

The comment which has been made concerning the unreasonableness of the ordinance provisions relating to solicitors applies with double force to these ''promoter'' provisions, and they are also subject to additional criticism.

From the definition of a ''promoter,'' as heretofore quoted (§ 44.01, *supra*), it appears that the term is not confined to business solicitors, such as employees of a promotion agency handling fund raising campaigns, but includes any person who for pecuniary compensation solicits for another. Many solicitors for charity are indigent religionists. As an integral part of the exercise of their religious right they solicit funds in support of their cause and the charitable activities incident to it, and of necessity they retain some portion of

the money collected in order that they themselves may be clothed and fed. To impose upon this class the burden of posting a $2,000 bond, of paying a license fee, and of showing sufficient financial responsibility to carry out the obligations incident to their solicitation is to seriously impede, if not prohibit, their undertakings at the outset. A required qualification of financial standing sufficient to enable such an applicant to post a $2,000 bond will neither insure honesty nor create a deterrent against fraud. In many cults and religions it is traditional that poverty and saintliness shall walk hand in hand. Many creeds view the possession of property and assets, or of more money than necessary for bare essentials, as a manifestation of sins of worldliness. Yet history shows that some of the finest deeds of charity and most unselfed works known to man have been accomplished by adherents of these views. It is thus a dangerous legislation which would impede the charitable impulses and hamper the undertakings of all but the financially able— which would give to men of property but deny to the poor the right equally possessed by both to develop and carry out the tenets of their creed.

The fee of $25 may not seem large but when it is combined with the expense and difficulty of obtaining a bond (if indeed such could be obtained by an indigent religionist even if the premium were paid for him), and establishing the vague condition of "financial responsibility," it involves cumulative burdens too heavy to be borne. In seeking to justify its declaration of the reasonableness of these provisions, the majority opinion states that the filing of a bond is "a common requirement in the regulation of occupations or activities involving the handling of entrusted funds," and that "The license fee is a reasonable one, covering the expenses of investigations and administration" (p. 20). This latter statement may have been inspired by the fact that the late federal decisions speak of the distinction between a license fee solely to defray the costs of enforcement of a regulatory statute and one for revenue purposes, condemning only the latter. But here, even if the regulatory provisions of the ordinance were otherwise reasonable as applied to religionists and justified the imposition of a fee sufficient to meet the costs of administration, there is no indication whatsoever that those costs would amount to $25 for the handling of each

application or that that sum was fixed in contemplation of reimbursement for expenses.

The following excerpt from *Murdock* v. *Pennsylvania*, 319 U. S. 105, pp. 111-113 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81], is pertinent: "It is plain that a religious organization needs funds to remain a going concern. . . . Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way. . . . Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance. Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse. Spreading religious beliefs in this ancient and honorable manner would thus be denied the needy. Those who can deprive religious groups of their colporteurs can take from them a part of the vital power of the press which has survived from the Reformation. . . . In all of these cases the issuance of the permit or license is dependent on the payment of a license tax. And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. It is in no way apportioned. It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment. Accordingly, it restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise. . . . So, it may not be said that proof is lacking that these license taxes either separately or cumulatively have restricted or are likely to restrict petitioners' religious activities. On their face they are a restriction of the free exercise of those freedoms which are protected by the First Amendment. . . . Itinerant evangelists moving throughout a state or from state to state would feel immediately the cumulative effect of such ordinances as they become fashionable. The way of the religious dissenter has long been hard. But if the formula of this type of ordinance is approved, a new device for the suppression of religious minorities will have been found. This method of disseminating religious beliefs can be crushed and closed out by the sheer weight of the toll or tribute which is exacted town by town, village by village. The spread of religious

ideas through personal visitations by the literature ministry of numerous religious groups would be stopped."

It will further be noted that the provision defining "promoters," as heretofore quoted (§ 44.01, *supra*), includes a special exemption running in favor of bona fide paid officers and employees of social service agencies endorsed by the board. The conditions which a social service agency must meet to secure endorsement are set forth in a detailed separate ordinance, the relevant portions of which are incorporated in the majority opinion by marginal reference. One condition is: "(h) That the officers and employees of such corporation or association are persons of good moral character and reputation and that the corporation or association has exercised reasonable care in selecting persons of good moral character and reasonable experience as solicitors for its funds."

Apparently no bonding or license requirement is imposed upon these solicitor-employees, or in their behalf upon the organization they represent. Thus the solicitors for the organized charity hold a great primary advantage over the unorganized worker, with no sound reason for the discrimination. Graft and corruption can flourish, and fraud can emanate from high places as well as low, and through organization these evils are sometimes hidden and the more securely entrenched. Also the percentage of contribution retained to meet the expenses and recompense the employees of charitable institutions is apt to be higher than that retained by unorganized workers or sincere and humble religionists who sacrifice all in the practice of their religion. Abuses and breaches of trust do occur but who can say that the hazard is greater in unorganized classes of workers, whose illicit gains are probably small, compared with what is lost when a large institution becomes permeated with corruption.

Vital need exists for the individual as well as for the organized worker in both charitable undertakings and general benefits derived from the spreading of religious doctrines. There are many dark places where the light of organized charity does not penetrate—many needy whom it does not reach. To these people the tender ministrations of sincere and unfettered religionists bring succor and salvation. The unreasonable curtailment of this activity merely because some are addicted to fraudulent and deceitful practices in the name of charity, is as unthinkable as would be the dis-

solution of established institutions merely because dishonesty and corruption have at times been uncovered in their administration. The public as a whole cannot be freed from the entire power of decision as to the worth of the cause for which they are solicited or their inclination to contribute. If the constitutional guarantees are to be upheld, then the public must expect to bear some portion of the burden of seeing that their gifts are made only to worthy and honestly administered causes.

Another objectionable provision of the ordinance is that which requires the promoter to furnish "a succinct statement of facts showing that the applicant . . . is of good character and reputation." Those who contribute to charity are not so much concerned with the "reputation" of the solicitor as they are with the intended use to which the donations are to be put. A most wicked man of public ill repute may espouse a very worthy cause or do a very good deed. Religionists and reformers are often called from the gutter whence they return to make expiation for their wrong doings by trying to save others from a like fate and to aid the redemption of those who may already have strayed. Forceful and effective work has been done by the reformed, turned reformer, and many of these people labor on without affiliation with any recognized institution and without financial help other than that gleaned through solicitation.

Hence, it would seem that if any statement is to be demanded in connection with a reasonable requirement for registration and identification it should embrace no more than an averment of present honesty and sincerity in the disbursement of money and property for the purpose for which they are solicited. Reputation is not an issue.

The requirement of section 44.19 that the officials may make an investigation and if "satisfied" that the applicant is of "good character and reputation" they may issue a license, places upon the applicant the burden of establishing this requirement as a condition precedent to the exercise of his right of religious liberty. Such a requirement is not a sufficiently fixed and definite standard to safeguard the free exercise of the constitutional right here involved. In the exercise of their power the officials might conclude that an applicant does not qualify merely because of their opinion concerning his particular religious belief and creed. The way of the dissenter is usually hard and by reason of his

views his reputation in the eyes of a large group, or a majority, may be far from good and his character at least questionable if not downright immoral. What fair qualification to the right of religious liberty can be conceived which limits its exercise to those who have good reputation and character, and denies it to those who have not?

It is said in *Murdock* v. *Pennsylvania, supra* (319 U.S. 105, 116): "Plainly a community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful. If that device were ever sanctioned, there would have been forged a ready instrument for the suppression of the faith which any minority cherishes but which does not happen to be in favor. That would be a complete repudiation . . . of the Bill of Rights." And again in *Cantwell* v. *Connecticut, supra,* (310 U.S. 296, 310): "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

Subdivision 6 of section 44.19 of the ordinance is also subject to criticism. It authorizes the revocation of the license where the licensee, in making the solicitation, is unfair, unjust, inequitable, or fraudulent. These grounds, except the one last stated, are vague and uncertain and may well result in the same religious censorship arising from a determination of good character and reputation.

Subdivision 8 of the section, dealing with the qualifications of solicitors for promoters, is subject to the same objections as the rest of the section. The only difference is the amount of the fee and the size of the bond. It requires a "good moral character," and a reputation for honesty that is good.

It is not an obstacle to plaintiff's attack on section 44.19 that it has not sought a license or that if the public officials act arbitrarily their action is subject to jurisdictional review.

The section on its face operates as a prior censorship on the free exercise of religious liberty. (*Cantwell* v. *Connecticut, supra.*)

There is another ordinance which concerns the regulation of pawnbrokers, secondhand dealers, and junk dealers (Los Angeles Municipal Code, § 24.01). Although its provisions must be considered in relation to the operation of the store or so-called industrial department of plaintiff, the subject need not be developed here, for from the evidence it is clear that the store partakes of enough of the character of a commercial enterprise to justify the restrictions imposed. In the main I can concur in the conclusions (although not the reasoning upon which they are based), expressed in the majority opinion with respect to this phase of the case. The store is not conducted as a profit making institution but it is in the business of selling used property. The operations of junk dealers and pawnbrokers have long been recognized as a distinct class of business subject to regulation under the police power in order to facilitate the recovery of stolen property and the preservation of health. (See 43 C.J. pp. 389-390; 43 Id. 410-411; 16 C.J.S., Constitutional Law, § 189.)

It is not contended that the regulatory provisions of section 24.01 are invalid if considered apart from the question of the guarantee of religious liberty. Even assuming that the section must be viewed in the light of the right of free exercise of religion, there seems to be nothing arbitrary or unreasonable in its regulatory requirements. The measure is patently a police regulation and the specified fee is not a tax for revenue. That fee does not have combined with it the other financial burdens imposed under the ordinance dealing with promoters and hence it is distinguishable. Moreover, the operation of the store has most of the aspects of an ordinary commercial enterprise.

Such ordinance (Los Angeles Municipal Code, § 24.01) provides that persons who are to engage in the regulated business must annually apply for and receive a written permit. Under subsection (c), entitled "Requisites of Permits," it specifies the following requirements or "standards": (1) The original application must state "by street and number the place where such business is proposed to be conducted" or, in the case of junk collectors having no fixed place of business, "their residence by street number." The applica-

tion "shall be signed by the applicant and shall contain his residence address." (2) The payment in advance of an annual fee of $25 ($50, if jewelry, watches "or similar secondhand merchandise" is to be dealt in). (3) Upon receipt of the application "the Board shall cause to be investigated the business of the applicant and location at which applicant proposes to engage in business as specified in said application. Thereafter the Board may issue a permit . . . for the remaining portion of the current year." (4) Persons operating under the ordinance must "secure an annual renewal of such permit commencing January 1st of the succeeding year." (5) Persons holding "an ordinary" permit must apply for and secure a "special permit," "in the manner provided . . . for securing ordinary permits," before dealing in "secondhand jewelry, precious stones, precious metals, . . . watches or other similar secondhand merchandise."

Further regulations or "standards" set by the ordinance include the following: "The Board shall not grant any permit . . . to persons who fail, refuse or neglect to comply with the laws and ordinances relating to and regulating the business for which such permit is sought"; "If persons holding permits . . . shall violate any of the provisions of this Section [the Municipal Code section setting forth the ordinance in question] or any provision of any other ordinance, or any law relating to or regulating any such business, or shall conduct or carry on such business in an unlawful manner, the Board . . . shall revoke such permit," but only upon following the procedure "in the manner provided in Section 22.02 of this Code" (which procedure is not questioned) ; permit holders "shall file daily reports, on forms provided by the Chief of Police, listing the merchandise received or purchased on the preceding day, the hour of such receipt or purchase, the "true name and address of the party making the sale, delivery or pledge as nearly as the same is known to or can be ascertained by such person together with a description of such party," the number of the pawn ticket issued, if a pledge is involved, and the amount loaned, and a description of each article pledged, received or purchased. The permit holder is also required to keep "a complete record of all goods . . . pledged to or purchased or received by him" which record "shall be open at all times during business hours to the inspection of any member of the Police Department."

The mentioned provisions (and the same is true of the further provisions not herein epitomized) are not unreasonable or uncertain. Substantially nothing more is required for an original permit than the payment of the moderate fee and the filing of the written and signed application giving the data as to the location of the proposed business and the applicant's name and residence address. The requirements for compliance with law and the keeping and filing of reports, etc., after commencing business, are reasonably related to the nature of the business and the purposes of the regulations. These latter provisions furnish a proper and exclusive standard for guidance of the board in passing on applications for renewals of permits or proceedings to revoke permits. The very moderate requirements for original issuance of permits, hereinabove set forth, leave little if anything, beyond the suitability of the proposed location, to the discretion of the board. This ordinance fully meets the constitutional requirements that regulatory laws of this type establish reasonable standards for the guidance of the permit-issuing board.

Defendants contend that injunctive relief is not available to plaintiff and that there is no showing of irreparable injury. Generally, public officers may be enjoined from enforcing an unconstitutional statute, and section 526(4) of the Code of Civil Procedure and section 3424(4) of the Civil Code have no application to such situations. (*Brock* v. *Superior Court,* 12 Cal.2d 605 [86 P.2d 805] ; *Bueneman* v. *City of Santa Barbara,* 8 Cal.2d 405 [65 P.2d 884, 109 A.L.R. 895].) Where a criminal statute or ordinance causes irreparable damage to property rights, the injured party may attack its constitutionality in an action to enjoin its enforcement. (See *Jones* v. *City of Los Angeles,* 211 Cal. 304 [295 P. 14] ; *Sullivan* v. *San Francisco Gas etc. Co.,* 148 Cal. 368 [83 P. 156, 7 Ann.Cas. 574, 3 L.R.A.N.S. 401] ; *Los Angeles T. Ins. Co.* v. *Los Angeles,* 52 Cal.App. 152, 156 [198 P. 1001] ; *San Diego T. Assn.* v. *East San Diego,* 186 Cal. 252 [200 P. 393, 17 A.L.R. 513] ; and *Abbey Land etc. Co.* v. *San Mateo,* 167 Cal. 434, 438 [139 P. 1068, Ann. Cas. 1915C 804, 52 L.R.A.N.S. 508].)

An interference with the solicitation by plaintiff of contributions is an interference with its property rights in the sense that its right to collect and then use the funds will be impeded. Even if it be assumed that no injury to property rights is threatened, it seems that injunctive relief would

be appropriate to restrain the enforcement of a criminal statute where the attack thereon consists of a bona fide claim that the statute violates one of the personal liberties guaranteed by the Constitution, and that claim is not wholly lacking in merit on its face. In such case the injury consists of the consequences of the enforcement of the law to the person, viewed in the light of the exalted standing of the constitutional guarantees. These consequences under the procedure in this state are serious.

A violation of the ordinance being a misdemeanor, the case would be cognizable only in an inferior court. From that court the only appeal available is to the superior court, or to its appellate department. If that court denied relief plaintiff would have no recourse to this court· or the district court of appeal by appeal or certiorari, although in the event of being imprisoned he would have the remedy of habeas corpus. (*Portnoy* v. *Superior Court*, 20 Cal.2d 375 [125 P.2d 487].) The cases heretofore cited are not determinative of the point. They merely state the rule that injunctive relief *will be given* if injury to property rights is threatened. That does not exclude such relief where the injury is to personal rights.

It has been recognized that personal rights may be protected by equity, and they obviously should be, as they are more sacred than property rights. It is said in 28 American Jurisprudence, Injunctions, section 71: ''However, there have always been some clearly defined exceptions to the general rule, and there is a progressive tendency on the part of the courts to remedy by injunction, injuries to personal rights. This is, perhaps, as it should be, because the personal rights of citizens are more sacred and, by every test, of more value than things that may be measured by a purely monetary standard, and the courts have expressed difficulty in understanding why injunctive protection of the one class of rights should be placed above similar protection of the other. It may be added that the courts with great uniformity base their jurisdiction to protect purely personal rights by injunction nominally on an alleged property right, where in fact no property rights are invaded, so that the rule seems to be one of those known chiefly by its breach rather than its observance.'' (See, also, 14 A.L.R. 295.) Section 526 of the Code of Civil Procedure does not limit the injury to property rights. On the contrary it authorizes an injunction where

the acts would produce great or irreparable injury "to a *party* to the action." (Italics ours.) (See *Nation* v. *Chism*, 154 Okla. 50 [6 P.2d 766].)

For the reasons above stated, I am of the opinion that the judgment of the trial court should be modified by restricting the injunctive relief to alleged violations of all provisions of the Municipal Code here involved except section 24.01 which I believe to be valid.

Schauer, J., concurred.

EDMONDS, J.—In this case, the trial court, upon undisputed evidence, found that the Gospel Army was soliciting donations for the purpose of furthering its religious activities. Because these funds are used in part for the purpose of giving relief to persons in distress, Mr. Justice Traynor declares, as a matter of law, its activities are charitable and not religious. I cannot concur in that conclusion, nor in the construction of the Los Angeles Municipal Code as requiring the issuance of permits to either organizations or promoters without an appraisal of "the nature or worthiness of a religious cause." And if, contrary to the evidence and findings of the trial court, the Gospel Army, as a matter of law, is a charitable institution, then, by the challenged ordinance it is arbitrarily denied the right to exist unless it complies with undisclosed standards of the commissioners and carries on its operations in accordance with arbitrary and unreasonable regulations.

As Mr. Justice Henshaw pointedly stated in considering an earlier ordinance of the city of Los Angeles, which, like the one now before the court, gave municipal authorities broad and arbitrary power over every institution ministering to human suffering and spiritual need, charity is a fundamental part of religion. Speaking of the work of the Salvation Army, he said: "Profoundly impressed with the Founder's sympathy for the poor and afflicted, and with His teachings that 'Now abideth faith, hope and charity, these three, but the greatest of these is charity,' and 'Now, the end of the commandment is charity out of a pure heart,' it has made its special field of religious work the relief of the destitute and the rescue of society's outcasts. It has found that it cannot lead the spirit of the weary and heavy burdened without first ministering to his physical necessities. While 'man does not

live by bread only,' he cannot live at all without bread. Therefore, the charitable organizations of the Salvation Army are vital, integral parts of its religious life and work." (*In re Dart*, 172 Cal. 47, 49 [155 P. 63, Ann.Cas. 1917D 1127, L.R.A. 1916D 905].)

The Gospel Army also endeavors to gain converts for its religious doctrines and carries on activities which minister to material need. The expense of conducting its work is largely met by donations of money and secondhand goods solicited from the public. The net proceeds from each of these main sources of income go into the Army's treasury from which is paid the cost of religious services, free distribution of tracts and religious literature, as well as food, lodging, clothing and other necessaries for those in need. The record discloses no segregation of such funds on the books of the Army as being for a religious or for a charitable purpose. Upon this evidence the trial court found that if the Gospel Army is required to comply with the provisions of the ordinance, such enforcement "will amount to a prior restraint on the exercise of their religious activities within the meaning of the Constitution of the United States. . . ." Mr. Justice Traynor sweeps aside the evidence and the trial court's findings upon the ground that, as a matter of law, charity has no place in religion, and whenever an organization carrying on religious activities steps aside from the promulgation of its spiritual doctrines to extend a helping hand by the alleviation of human suffering, it becomes subject to onerous and restrictive regulations. So narrow a view of the practice of religion runs counter to all of the fine principles of human conduct which, more and more, are leading men of good will to help those less fortunate along the daily path. A religious man, it has been said, is one "whose light shines in the dark places of the earth through righteous acts and helpful deeds."

Large groups of citizens of every faith and creed are regularly devoting much time and effort, at great personal sacrifice, to the cause of those who are in need. If the work in behalf of the less fortunate among us is done in the name of or in connection with the promulgation of a religious doctrine, then the Los Angeles ordinance authorizes the Department of Social Service to add to the indifference, inertia and self-interest which solicitation must always overcome, either the condemnation or damnation by faint praise of an official bureau which is authorized to reach a conclusion without

regard to anything but the personal opinion of some administrative officer as to the worthiness of the purpose. Whatever is done in the name of religion for a charitable purpose, the ordinance declares in effect, is to be viewed with suspicion and distrust. There can be preaching without official intervention, but any practice of Christian virtues is to be carried on only under the watchful eye of the Department of Social Service according to its notions of "the public interest." And yet my associates say that such legislation lays no restraint upon religious freedom.

It is, of course, true that reasonable regulations may be imposed upon an organization carrying on religious activities. The rule, as stated by the Supreme Court of the United States, is that "The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose." More specifically, the court declared that "A state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and authority to act for the cause which he purports to represent." (*Cantwell* v. *Connecticut*, 310 U.S. 296, at pp. 304, 306 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].)

But the ordinance here challenged goes far beyond these limits. As the statute reads, its provisions shall not be applicable "to solicitations made solely for evangelical, missionary, or religious purposes." These terms are not defined, yet the lawmakers provided "that in any case where it shall come to the attention of the Board that any solicitation has been or is being or intended to be made for evangelical, missionary or religious purposes but in such manner as in the opinion of the Board is calculated to give or may give the impression to the person or persons solicited in any such solicitation or to the public that the purpose of such solicitation is either in whole or in part charitable, then the Board, if in its opinion the public interest will be subserved thereby, shall investigate the matter of such solicitation and give publicity to its findings thereon in such manner as it may deem best to advise the public of the facts of the case." (§ 44.16.) If this curious language means anything, it extends the exemption to any solicitation in behalf of a religious organization for a purpose in whole or in part charitable but allows the Board

of Social Commissioners to state to the public, "in such manner as it may deem best", its official disapproval of any such practical application of the Master's teachings to human need or of the methods by which help is being extended. Under that construction of the exemption provision, no license for the appellant's solicitations may be required. But it probably would be more disastrous to the work of a religious organization to arbitrarily and publicly condemn its activites than to require it to obtain a license, and equally violative of constitutional guarantees.

Considering the provisions of the ordinance from the standpoint that, under its express terms, only solicitation for contributions to meet the expense of doctrinal church activities is exempt from regulation, although the good works done by an organization such as the Gospel Army are, to borrow Mr. Justice Henshaw's words, "vital, integral parts of its religious life and work", no person may solicit a contribution for its support who has not obtained an "information card". Such a card is issued by the Department of Social Service only following the filing of a "notice of intention" to solicit, which shall include the detailed information specified by section 44.05 of the code. (*Ante*, p. 251.) This information is not limited to facts relating to the identity of the proposed solicitor and his authority to act for a particular organization. Also there must be submitted detailed information relating to the organization's purpose and business affairs and those who are supporting it financially or employed in its activities. In short, all of the data demanded concern the merits of the cause which is asking the public for assistance and the scope of the work it is carrying on.

Moreover, the information card which allows one to solicit, providing he presents it to the person who is approached for a donation, "allowing him sufficient opportunity to read the same, before accepting any contribution. . . ." (§ 44.12), is not issued as of course upon the filing of the notice of intention. There is neither requirement nor even suggestion in the ordinance to support Mr. Justice Traynor's assertion that these cards, "which are in effect permits to solicit, are issued automatically upon the filing of the required information and the payment of the 4¢ for each card." On the contrary, the Department of Social Service shall have the power: "(a) To investigate the allegations of the Notice of Intention, or any statement or reports; (b) To have access to and inspect and

make copies of all books, records and papers of such person, by or on whose behalf any solicitation is made; (c) To investigate at any time the methods of making or conducting any such solicitation. . . ." (§ 44.03.)

A majority of the court sanction the indefinite terms of the ordinance relating to the issuance of a permit upon the presumption that the Board of Social Service Commissioners will fairly investigate the facts in connection with each application and promptly make a determination upon them. It may not be assumed, say my associates, that the board will whimsically or capriciously deny an application, and the courts will relieve from unjust and arbitrary action. The same argument was advanced by the state in *Cantwell* v. *Connecticut, supra,* and summarily rejected. The opportunity to obtain judicial correction, said Mr. Justice Roberts, speaking for the court, does not justify interference with constitutional rights. ". . . The availability of a judicial remedy for abuses in the system of licensing still leaves that system one of previous restraint which, in the field of free speech and press, we have held inadmissible. A statute authorizing previous restraint upon the exercise of the guaranteed freedom by judicial decision after trial is as obnoxious to the Constitution as one providing for like restraint by administrative action." (p. 306.)

Moreover, the inquisitorial authority of the department is a continuing one. "Whenever, in the opinion of the Board of Social Service Commissioners the Notice of Intention does not disclose sufficient information for the public concerning the facts . . . required to be stated in such Notice or concerning the person or association making such solicitation or on whose behalf such solicitation is made, then, upon the request of said Department, there shall be filed, in writing, within forty-eight (48) hours after such request, such additional information as may be required by said Board upon the foregoing subjects." (§ 44.06.) This right may be exercised after the Board has made an investigation, and there is no limitation upon the time within which inquiries must be concluded. Also, there is no restriction upon the number of additional requests the board may make for information, or any time fixed in the ordinance to prevent the board from taking months to look into the purpose and scope of an organization's activities; designed delay is invited by the censorious terms of the legislation, and the widest discretion is given to harass, condemn, delay and obstruct. And if perchance the appli-

cant represents an unpopular cause, then the authority of the Board of Social Service Commissioners to publish the results of its investigations "by such means as may be deemed best to reach the general public and persons interested" (§ 44.02) gives opportunity for the undermining of public confidence and provides a vehicle for official propaganda which may do irreparable damage.

Occasion for discrimination is also afforded by section 44.03 which allows the Department of Social Service to issue an information card in a form stating either that the authorization given does or does not constitute an endorsement of the charitable association for which solicitation is to be made. Moreover, the information card may show the pertinent facts set forth in the notice of intention and any additional information "as shall in the opinion of the Board be of assistance to the public to determine the nature and worthiness of the purpose for which the solicitation is made. . . ." The information card which the solicitor must carry with him, and either read to each prospective contributor or present to such person for his perusal, allowing him sufficient time to read it before accepting any donation, may therefore be a sizable volume of data which in practice, if not in purpose, will effectively block public support of an organization which has a legitimate purpose and against which no criticism justly may be made.

To meet the demands of the city, the receipt required for each donation must be signed by the solicitor and contain "in addition to a description of the amount and kind of the contribution, substantially the following matters: (a) The name of the association, if any, in whose name or upon whose behalf the solicitation is made. (b) A statement as to whether the contribution solicited is to be applied for the general purposes of such association, if any, or for specific purposes, and if for specific purposes the nature thereof shall be clearly stated. (c) A statement that the Information Card, issued by the Department, was presented to the person making the contribution for his perusal prior to receipt by the solicitor of the contribution receipted for. . . ." (§ 44.15.) Only by means of a traveling office could a solicitor comply with all of these requirements.

As justification for his position, Mr. Justice Traynor asserts that "activities characteristic of the secular life of the community may properly be a concern of the community even

though they are carried on by a religious organization." A host of decisions is cited in support of that statement. But the cases relied upon are authority only for the proposition that certain activities such as the sale of religious periodicals by minors, beating a drum on the traveled portions of the city streets, and parades, carried on by a church, are subject to reasonable regulation by the state under its police power; they do not purport to declare what may be done in the field of reasonable regulation of solicitation for religious purposes. Indeed, excluding *In re Dart, supra,* only two of them concerned the constitutionality of a statute regulating the solicitation of funds. One of these two, *Prince* v. *Massachusetts,* 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645], upheld a statute restricting the activity of minors. The other decision, *Murdock* v. *Pennsylvania,* 319 U.S. 105 [63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81], expressly excluded consideration of the question now in controversy, for the court declared that there was no issue before it in regard to a registration system for solicitors.

As to *In re Dart, supra,* the statement from it which is quoted in the majority opinion has no application to solicitation for religious work; it concerns the regulation of organizations which seek contributions for charitable purposes. The declaration that, under the police power, there may be reasonable supervision over persons engaged in the occupation of obtaining money from the public for the maintenance of an organization carrying on charitable work is followed by the pronouncement: "Every person has the right, under our constitution, and perhaps without its guarantee, to solicit contributions for a worthy charitable purpose, provided he acts in good faith and honestly applies them to that purpose. The ordinances give the commission power to deprive persons of that right without cause or reason. To the extent that they give this arbitrary power they are contrary to the constitution and void." (*In re Dart, supra,* at p. 57.) Certainly the constitutional guarantee gives as much, if not greater, protection to religious endeavors which include ministration to relieve human suffering. For as James wrote concerning faith without works, "If a brother or sister be naked, and destitute of daily food, And one of you say unto them, Depart in peace, be ye warmed and filled; notwithstanding ye give them not those things which are needful to the body; what doth it profit?" (Jas. 2:5, 16.)

But if the practice of religion may be legally isolated beyond the contaminating reach of charity, then, in my opinion, the legislation is vulnerable to attack as unlawfully circumscribing the activities of every organization which carries on its work without the profession of religious doctrine. Unquestionably the occupation of the solicitation of contributions for charitable purposes may be subjected to regulation, but legislatures or municipalities may not, under the guise of the police power, impose unnecessary and unreasonable restrictions upon the use of private property or the pursuit of useful activities. (*McKay Jewelers Inc.* v. *Bowron,* 19 Cal.2d 595 [122 P.2d 543, 139 A.L.R. 1188] ; *In re Fuller,* 15 Cal.2d 425 [102 P.2d 321] ; *Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213 [93 P.2d 93] ; *In re Monrovia Evening Post,* 199 Cal. 263 [248 P. 1017] ; *Frost* v. *City of Los Angeles,* 181 Cal. 22 [183 P. 342, 6 A.L.R. 468] ; *Ex parte Dickey,* 144 Cal. 234 [77 P. 924, 103 Am.St.Rep. 82, 1 Ann.Cas. 428, 66 L.R.A. 928] ; *Larson* v. *Bush,* 29 Cal.App.2d 43 [83 P.2d 955].) Also the general and indefinite terms used in the ordinance wholly fail to meet the constitutional requirement that a regulatory statute must specify a standard for official action. (*In re Dart, supra; Hewitt* v. *State Board of Medical Examiners,* 148 Cal. 590, 593 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A.N.S. 896] ; *Schaezlein* v. *Cabaniss,* 135 Cal. 466, 469 [67 P. 755, 87 Am.St.Rep. 122, 56 L.R.A. 733] ; *County of Los Angeles* v. *Hollywood Cemetery Assn.,* 124 Cal. 344, 349 [57 P. 153, 71 Am.St.Rep. 75] ; *Ex parte Sing Lee,* 96 Cal. 354, 359 [31 P. 245, 31 Am.St.Rep. 218, 24 L.R.A. 195] ; *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] ; *Hoyt Bros. Inc.* v. *Grand Rapids,* 260 Mich. 447 [245 N.W. 509].)

The provisions of the Municipal Code which have been summarized in connection with the discussion concerning their application to the charitable work of a religious organization effectively hamper and restrict any endeavor to better the lot of those in need of material aid and comfort if that effort does not conform to an undisclosed standard. The work of every organization must meet the approval of the department; such as do not, are unfit to live. Moreover, in its practical aspects the ordinance is particularly burdensome upon organizations such as the Gospel Army, which continually solicits donations. ''Every person soliciting any contribution

for any charitable purpose must file with the Department within 30 days after the close of any such solicitation or within 30 days after a demand therefor by the Department a report to the Department, stating the contributions secured from or as a result of any such solicitation, and in detail all expenses of or connected with such solicitation, and showing exactly for what uses and in what manner all such contributions were or are to be disbursed or distributed." (§ 44.14.) What constitutes "the close of any such solicitation?" And to what extent must the organization show "exactly for what uses and in what manner all such contributions were or are to be disbursed or distributed?" Is every person who is a beneficiary of the organization's helpfulness to be named? Is the value of that aid to be stated in terms of money or spiritual comfort? Must a substantial part of the effort intended for human betterment be devoted to making reports to a governmental agency set upon the minute and continuing supervision of all charitable activities?

Very obviously, the purpose of these reports is to provide a basis for keeping each organization within the range of a policy which is not stated in the ordinance and may be as variable as differing views upon permissible bounds of social service. For an information card may be recalled by the board upon receipt of data which, in its opinion, shall render incorrect any statement set forth in that document. Under such circumstances, the board shall amend or correct the card, or issue a new one in accordance with the additional data obtained. But impliedly each card is to be issued for a period which need not be uniform as to all applicants, and is valid only during that time (§ 44.02). Under those provisions, only by carrying on its work in accordance with the views of the Board of Social Service Commissioners, and making reports in such detail as to satisfy demands which cannot be measured against any standards set by law, may an organization continue.

Also, there is no standard or limitation provided in regard to the data printed upon the information card. As a solicitor must show this card to each prospective donor, allowing him sufficient opportunity to read it before accepting any contribution, the board may arbitrarily express disapproval of a worthy charity or make the information so voluminous that solicitation would be effectively blocked. And the unlimited

power given to the board to publish the results of its investigations is broad enough to authorize presentation to the public of confidential data concerning policies and details of management having no relation to reasonable licensing requirements.

If an organization runs the gauntlet of these provisions and is able to carry on its work to the satisfaction of the official censors of charitable purposes, every person whom it employs for "pecuniary compensation or consideration" to obtain subscriptions from the public must also secure a license. The way of an applicant for such a license is a hard one. In his application he must set forth, in addition to facts showing that he "is of good character and reputation," "such information as may be required by the board." Thereupon, the board shall make such investigation of the applicant and his affairs as it deems advisable. No limitation as to the extent of such an investigation is imposed and no time is fixed within which it must be concluded. Any ground that would have led to a denial of the license is also ground for its revocation.

If, contrary to the narrow interpretation of religion laid down by my associates, human kindness is included in its practice, then these provisions governing the licensing of individuals to solicit contributions are clearly invalid, for they go much further than to lay down a reasonable requirement for registration and identification. Indeed, there is no statutory statement of the data which an applicant must submit, for the specified information is "in addition" to that which may be required by the board. The majority allows the regulation of solicitation for religious purposes to go far beyond the limitation specified by the United States Supreme Court in the Cantwell case, *supra*, by approving the requirements that a promoter or a solicitor be granted a license only if the board is satisfied that he is of good character and reputation and equal to the financial responsibility incident to the proposed solicitation; that he file a bond and pay a license fee; and that he give a complicated form of receipt to each contributor. The provision authorizing the revocation of a license after a hearing, for any "unfair, unjust, inequitable or fraudulent" act or for any ground that would have led to a denial of the license also goes far beyond the permissible bounds fixed for regulation of solicitation for a religious purpose.

And construing any organized plan for taking care of those in need of material aid as beyond the reach of religious duty or concern, the licensing provisions which have been mentioned in the next to the last paragraph unreasonably restrict the right of an individual to engage in the business of solicitation for charitable purposes and also fail to set up a definite standard which the applicant for a license must meet. The cases cited by the majority as authority for the proposition that a promoter or solicitor may be required to submit proof of his good character and reputation stand only for the rule that a state may do so in connection with regulation of the practice of a profession which requires the possession of special knowledge, skill and training, or the sale of merchandise of a particular character. (*Leach* v. *Daugherty,* 73 Cal.App. 83 [238 P. 160] [broker's certificate under the Corporate Securities Act] ; *Riley* v. *Chambers,* 181 Cal. 589 [185 P. 855, 8 A.L.R. 418] [license of real estate broker] ; *Gundling* v. *Chicago,* 177 U.S. 183 [20 S.Ct. 633, 44 L.Ed. 725] [license for sale of cigarettes].) These decisions, in my judgment, have no application to legislation laying down licensing requirements for the business of soliciting funds for charitable purposes.

A recent controversy in Michigan presented substantially the same question as is now before this court. An ordinance which prohibited the solicitation of contributions or the sale of goods ."the proceeds from which, or any part thereof, are to be used for any so-called charitable purpose" without a written permit to be granted by the city manager, when it appeared, after investigation and report by a police officer, "that the charity is a worthy one" and that the applicants for a permit "are fit and responsible parties," was held to violate the provisions of a state constitution prohibiting deprivation of life, liberty, or property without due process of law. "It is requisite to the validity of the ordinance," said the court, "that it should state 'a standard for the guidance' of the official who passes upon the application for the permit. . . . The general and indefinite terms used in this ordinance wholly fail to comply with this requisite." (*Hoyt Bros. Inc.* v. *Grand Rapids, supra,* [128 A.L.R. 1363].)

Turning to the other provision of the Los Angeles Municipal Code which is in controversy, although, generally speaking, the business activities of a religious organization come within the scope of regulations tending to protect the morals,

safety or general welfare of the public, section 24.01 relating to dealers in secondhand goods is also unconstitutional for the reason that it sets no standard to which an applicant for a license must conform. To carry on the business of a "secondhand dealer," one must "file an application in writing with the Board [of Police Commissioners] specifying by street and number the place where such proposed business is proposed to be conducted or carried on; . . . The application shall be signed by the applicant and shall contain his residence address. Upon receipt of such application the board shall cause to be investigated the business of the applicant and location at which applicant proposes to engage in business as specified in said application. Thereafter the board may issue a permit to the applicant which shall be effective for the remaining portion of the current year."

This enactment states no grounds justifying a denial of the application, specifies no time within which an investigation must be made, makes no provision for a hearing upon the application, and by the use of the word "may," impliedly allows the board to grant or withhold official favor for any reason which whim or fancy may dictate. No standard of character or business responsibility is set for the guidance of the board nor are there any qualifications specified for one desiring to deal in secondhand goods. Such legislation has uniformly been held not to measure up to the requirements of constitutional guarantees. (*In re Dart, supra; Hewitt* v. *State Board of Medical Examiners, supra; Schaezlein* v. *Cabaniss, supra; County of Los Angeles* v. *Hollywood Cemetery Assn., supra; Ex parte Sing Lee, supra; Yick Wo* v. *Hopkins, supra; Hoyt Bros. Inc.* v. *Grand Rapids, supra.*)

Under these circumstances, in my opinion, as the right of the Gospel Army and those acting in its behalf to solicit contributions for either religious or charitable purposes is a property right, the unlawful interference with which will cause irreparable injury, the trial court properly enjoined the enforcement of the ordinances here challenged (*Brock* v. *Superior Court*, 12 Cal.2d 605 [86 P.2d 805] ; *Bueneman* v. *City of Santa Barbara*, 8 Cal.2d 405 [65 P.2d 884, 109 A.L.R. 895] ), and the judgment should be affirmed.

Respondent's petition for a rehearing was denied December 17, 1945. Edmonds, J., Carter, J., and Schauer, J., voted for a rehearing.